

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE SEP 1 8 2014

~~Madsen~~ C.J.

CHIEF JUSTICE

This opinion was filed for record
at 8:00 AM on Sept. 18, 2014

~~Ro. R. Carpenter~~

Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DONNA WALSTON, individually and as personal representative of the Estate of Gary G. Walston, | ) ) ) ) | No. 88511-7 |
| | ) | En Banc |
| Petitioner, | ) ) | |
| v. | ) ) | |
| THE BOEING COMPANY; and SABERHAGEN HOLDINGS, INC., as successor to TACOMA ASBESTOS COMPANY and THE BROWER COMPANY, | ) ) ) ) ) ) | |
| Respondents. | ) | Filed    SEP 1 8 2014 |
| | ) | |

OWENS, J. -- In 1911, the legislature passed the Industrial Insurance Act (IIA), Title 51 RCW, creating a no-fault system for efficiently compensating workers injured on the job. As part of that system, employers receive immunity from civil suits resulting from on-the-job injuries. RCW 51.04.010. However, the legislature specified that employers that *deliberately* injure their employees are not immune from suit. RCW 51.24.020. Under our precedent, an employer deliberately injures an employee if "the employer ha[s] actual knowledge that an injury [is] certain to occur

and willfully disregard[s] that knowledge." *Birklid v. Boeing Co.*, 127 Wn.2d 853, 865, 904 P.2d 278 (1995).

In this case, Gary G. Walston was exposed to asbestos while working at The Boeing Company and was later diagnosed with mesothelioma. The Court of Appeals held that pursuant to the IIA, Boeing was immune from suit because Walston had not raised a material question of fact as to whether Boeing had actual knowledge that injury was certain to occur. We agree. Walston has not made such a showing, and therefore, he is limited to the recovery provided by the IIA's workers' compensation system.

## FACTS

Walston worked for Boeing from 1956 to 1995. Although Walston was exposed to asbestos throughout his career with Boeing, at issue in this case is an incident of asbestos exposure that occurred in 1985. In January of that year, maintenance workers began repairing pipe insulation in the ceiling above the hammer shop. Specifically, the workers rewrapped the overhead pipes to contain flaking asbestos insulation. These maintenance workers used ventilators and protective clothing referred to as "moon suits" during the project. Clerk's Papers (CP) at 2014. Although this work occurred overhead, Walston and the other hammer shop employees continued work below without protective ventilators or clothing. The repairs created visible dust and debris, and Walston used a plastic covering to protect

his toolbox. Walston and other hammer shop employees requested that they work in a different location during the pipe repair. The supervisor told them to go back to work but recommended that they avoid working directly under the overhead repairs.

Walston was diagnosed with mesothelioma, a lung disease caused by inhaling asbestos fibers, in 2010. He passed away in April 2013. One of Walston's experts, Dr. Carl Brodkin, concluded that Walston's exposure during 1985 was "likely by far . . . the highest level of exposure experienced by Mr. Walston" during his Boeing career and "a component part of Mr. Walston's cumulative exposure that resulted in his development of Mesothelioma." CP at 2873. Another expert witness, Dr. Arnold Brody, testified that an individual exposed to asbestos fibers at levels greater than background sustain an immediate microscopic injury that is not observable. However, another of Walston's experts, Dr. Andrew Churg, conceded that asbestos exposure is not certain to cause mesothelioma or any other disease.

Walston sued Boeing, claiming that his disease was caused by his exposure to asbestos while employed by the company. Boeing does not dispute that it was aware that asbestos was a hazardous material in 1985. Neither does Boeing dispute the facts underlying the 1985 incident. Instead, it argues that it did not have actual knowledge that Walston was certain to be injured and therefore it is immune from suit under the IIA. Boeing moved for summary judgment, but the trial court denied the motion. The Court of Appeals reversed and remanded for entry of an order granting summary

3

judgment to Boeing. *Walston v. Boeing Co.*, 173 Wn. App. 271, 288, 294 P.3d 759 (2013). We granted review. *Walston v. Boeing Co.*, 177 Wn.2d 1019, 304 P.3d 115 (2013).

## ISSUE

Has Walston raised a question of material fact as to whether Boeing had actual knowledge that he was certain to be injured by the asbestos exposure, thus allowing him to pursue his claim outside of the IIA's workers' compensation system?

## STANDARD OF REVIEW

When reviewing summary judgment, we engage in the same inquiry as the trial court. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). Summary judgment is appropriate only if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). All facts must be considered in the light most favorable to the nonmoving party. *Vallandigham*, 154 Wn.2d at 26. Summary judgment is granted only if, given the evidence, reasonable persons could reach only one conclusion. *Id.* The moving party bears the burden of showing that there is no genuine issue of material fact. *Id.* If this burden is satisfied, the nonmoving party must present evidence demonstrating material fact. *Id.* Summary judgment is appropriate if the nonmoving party fails to do so. *Id.*

ANALYSIS

The IIA created the workers' compensation system, which we have described as a "grand compromise" that gave employers "immunity from civil suit by workers" in return for giving injured workers "a swift, no-fault compensation system for injuries on the job." *Birklid*, 127 Wn.2d at 859.

However, the IIA does not exempt employers from civil claims filed by employees with injuries resulting "from *the deliberate intention* of his or her employer to produce such injury." RCW 51.24.020 (emphasis added). Until the *Birklid* case in 1995, this exception was mainly applied in cases of physical assault against an employee. *See Birklid*, 127 Wn.2d at 861-62. In *Birklid*, we considered for the first time a situation in which an employer knew in advance that its workers would become ill from the use of a new resin, yet still decided to put the resin into production. *Id.* at 863. The employer "then observed its workers becoming ill from the exposure." *Id.* We held that "deliberate intention" includes when "the employer had *actual knowledge* that an injury was *certain to occur* and willfully disregarded that knowledge." *Id.* at 865 (emphasis added).

Before adopting that narrow test, we reviewed broader tests from other jurisdictions and rejected them. *Id.* at 863-65. In particular, we considered a test that defined deliberate intention to include situations in which the injury is "'substantially certain to occur.'" *Id.* at 864 (quoting *Beauchamp v. Dow Chem. Co.*, 427 Mich. 1,

5

22, 398 N.W.2d 882 (1986)). We rejected that test and instead adopted a narrower test for Washington. *Id.* at 865. Thus, "deliberate intention" is a high standard that is met in Washington only when an employer had actual knowledge that an injury was certain to occur. *Id.* An act that has substantial certainty of producing injury is insufficient to meet that standard. *Id.* at 860. Similarly, negligence—even gross negligence—is not sufficient to meet the "deliberate intention" standard. *Id.*

We addressed the deliberate intention standard again in the *Vallandigham* case, where a school district was sued by two employees who had been injured by a severely disabled special education student. 154 Wn.2d at 17. The same student had injured staff members approximately 96 times during one school year. *Id.* at 24. We affirmed summary judgment for the school district, holding that the school district had no actual knowledge that injury was certain to occur. *Id.* at 35. The holding was based in part on the unpredictable nature of the special education student's behavior. Although the district acknowledged that it was aware that further injuries to school employees was a "'probability,'" we reiterated that "[e]ven substantial certainty that employee injury will occur by virtue of an employer's action (or inaction) is insufficient." *Id.* at 21, 36. "Disregard of a *risk* of injury is not sufficient to meet the [*Birklid* test]; *certainty* of actual harm must be known and ignored." *Id.* at 28.

The holdings from *Birklid* and *Vallandigham* are binding on this case. As the experts in this case acknowledge, asbestos exposure is not certain to cause

mesothelioma or any other disease. It does cause a *risk* of disease, but as we have previously held, that is insufficient to meet the *Birklid* standard. *Id.* Walston has not raised an issue of material fact as to whether Boeing had *actual knowledge* that injury was *certain to occur*. And to the extent that Walston argues that the deliberate intention standard is satisfied as long as the employer knows that *someone*, not necessarily the plaintiff, is certain to be injured, this court already rejected that argument in *Birklid*. 127 Wn.2d at 865. Therefore, the Court of Appeals properly remanded for entry of an order granting summary judgment to Boeing.

Walston contends that under the Court of Appeals' holding, deliberate intention can be found only when the injury is immediate and visible. This is an incorrect reading of the Court of Appeals opinion. The Court of Appeals explained that immediate and visible injury is one way to raise an issue of material fact as to whether an employer had constructive knowledge that injury was certain to occur. *Walston*, 173 Wn. App. at 284. The court noted that this was how the employees raised an issue of material fact in *Birklid* and other cases involving exposure to toxic chemicals. *Id.* Since immediate and visible injury was not present in this case, Walston could not use that to show that Boeing had knowledge of certain injury. However, the Court of Appeals did not hold that immediate and visible injury is the *only* way to show an employer's knowledge that injury was certain to occur.

Finally, Walston asks the court to find that Boeing had actual knowledge of certain injury because individuals exposed to asbestos are injured at the cellular level. We reject that argument because it would be inconsistent with the standard developed in *Birklid* and *Vallandigham*. Under *Birklid*, a risk of injury is insufficient to meet the deliberate intention standard. The asymptomatic cellular-level injury here is not itself a compensable injury. *See, e.g., Dep't of Labor & Indus. v. Landon*, 117 Wn.2d 122, 125-28, 814 P.2d 626 (1991) (holding that a disease does not occur upon exposure; it occurs when it manifests itself). Instead, as Walston's experts acknowledge, the asymptomatic cellular-level injury resulting from the exposure to asbestos created a *risk* of compensable injury. Thus, even if Boeing had actual knowledge that exposure to asbestos would cause asymptomatic cellular-level injury, the *Birklid* deliberate intention standard would not be met.

## CONCLUSION

Workers who are injured on the job are compensated through the workers' compensation system except in those egregious cases where the employer deliberately intended to injure the workers. Applying the standard set out in *Birklid*, we conclude that Walston has not raised a question of material fact as to whether Boeing had actual knowledge of certain injury resulting from the asbestos exposure. Therefore, Walston has not shown that Boeing deliberately intended to injure him and cannot pursue a claim outside of the workers' compensation system. We affirm the Court of Appeals

and remand for entry of an order granting summary judgment to Boeing on Walston's

claims.

_____ Owens, J

WE CONCUR:

Madsen, C.J. _____

_____

Fairhurst. J. _____

_____

Leach, J.P.T. _____

No. 88511-7

WIGGINS, J. (dissenting)—The majority holds that the deliberate injury provision in the Industrial Insurance Act (IIA), Title 51 RCW, does not apply when an employer knowingly and intentionally exposes an employee to high levels of asbestos causing that employee to develop and eventually die from an asbestos-related disease. I disagree.

I would hold that while it is a close call, petitioners Gary G. Walston and Donna Walston (Walston) have presented sufficient evidence to survive summary judgment. By 1985, The Boeing Company knew that forcing its workers to inhale asbestos fibers causes immediate scarring of lung tissue and long-term disease such as mesothelioma. Nevertheless, Boeing forced Walston to work under a shower of asbestos over his objection. The IIA specifically exempts deliberately caused diseases from employer immunity. RCW 51.24.030(3). Walston's evidence, including expert testimony that inhaling asbestos causes certain injury to the lungs, raises questions of fact as to whether Boeing knew its employees were being injured and willfully disregarded that knowledge. Thus, I would hold that the trial court properly denied Boeing's motion for summary judgment, I would reverse the Court of Appeals, reinstate the trial court's denial of Boeing's summary judgment motion, and remand for further proceedings.

ANALYSIS

I.   Under *Birklid*, an Employer Must Know That Injury Is Certain To Occur but Need Not Foretell Every Specific Harm or Victim

Title 51 RCW (Washington's IIA) generally limits a worker's right to recover for workplace injuries to benefits under the statute but permits an employee to sue the employer "[i]f injury results to a worker from the deliberate intention of his or her employer to produce such injury . . . ." RCW 51.24.020. We considered the meaning of "deliberate intention" in *Birklid v. Boeing Co.*, 127 Wn.2d 853, 904 P.2d 278 (1995). In *Birklid*, Boeing tested new fiberglass parts impregnated with a resin used to make interior parts for its airplanes. When workers became ill upon exposure to the resin, a supervisor requested improved ventilation, but Boeing refused, "apparently for economic reasons." *Id.* at 856. "As Boeing's supervisor predicted, when full production began, workers experienced dermatitis, rashes, nausea, headaches, and dizziness." *Id.*

We noted in *Birklid* that the central feature distinguishing that case from all prior cases involving the intentional injury exception was that Boeing knew in advance that its workers would suffer injury from working with the new material. *Id.* at 863. We concluded that the injuries were not an accident and that the case involved "willful disregard of actual knowledge by the employer of continuing injuries to employees." *Id.* We held that "the phrase 'deliberate intention' in RCW 51.24.020 means the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge." *Id.* at 865.

2

Here, the injury at issue is a disease. The legislature provided that for the purpose of injury intentionally inflicted by the employer, "'injury' shall include any physical or mental condition, disease, ailment or loss, including death, for which compensation and benefits are paid or payable under this title." RCW 51.24.030(3). The IIA generally defines "injury" as "a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditions as result therefrom." RCW 51.08.100. An "occupational disease" means a disease or infection that arises out of employment. RCW 51.08.140. By defining "injury" to include "disease" for purposes of the "deliberate intent" exception, the legislature envisioned certain circumstances where an employer knowingly exposes workers to conditions certain to produce a disease.

Diseases differ from traditional workplace injuries.[1] For example, physical injuries are often immediately visible, while diseases have latency periods with symptoms materializing sometime after exposure. Relatedly, there is no way to know with absolute certainty that an exposed individual will ever contract a disease. Moreover, most diseases are caused by multiple factors, which can make it difficult to prove causation.

---

[1] A search of Washington cases involving intentionally produced disease yielded no results. For this reason, I find our case law instructive but not controlling. *See, e.g., Birklid*, 127 Wn.2d at 856 (physical condition case involving dizziness, dryness in nose and throat, burning eyes, and upset stomach); *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 19, 109 P.3d 805 (2005) (scratches and slaps).

3

This case involves a disease arising from exposure to a toxic substance. Most toxic exposure injuries are dose-related, meaning the greater the exposure, the more severe the consequences. In addition, whether an exposed individual will suffer a compensable injury depends in part on vulnerabilities unique to that person. These qualities makes it near impossible to predict with absolute certainty how each exposure will affect a particular individual.

Asbestos is one of the most notorious of hazardous substances injuring workers in cases brought into our courts. In addition to a long latency period, asbestos-related injuries are continuous, progressive, and cumulative. Each exposure builds on the last and can lead to any number of injuries at any given point in time including shortness of breath, asbestosis, mesothelioma, lung cancer, or a number of other late-appearing cancers. It is true that exposure to asbestos gives rise to uncertainties inherent in predicting specific toxic-produced injuries. And yet, we know that inhaling asbestos causes injuries. *See Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 260, 744 P.2d 605 (1987) (holding that defendant had continuing duty to warn of hazards of asbestos after exposure); *Macias v. Saberhagen Holdings, Inc.*, 175 Wn.2d 402, 406, 282 P.3d 1069 (2012) (holding that respirator manufacturers were not entitled to summary judgment where victim died from "mesothelioma, a deadly type of cancer associated with asbestos exposure," after using product).

Indeed, these qualities, along with the certainty that inhaling asbestos initiates a specific injurious process, have led federal courts to define the

4

"occurrence" of injury in asbestos cases as a continuing process, beginning with

the inhalation of asbestos fibers and ending years later with the manifestation of an

asbestos-related disease. *See ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d

968, 972 (3d Cir. 1985) ("bodily injury" means any part of the single injurious

process that asbestos-related diseases entail); *Keene Corp. v. Ins. Co. of N. Am.*,

215 U.S. App. D.C. 156, 667 F.2d 1034, 1046 (1981) (inhalation exposure is part

of injurious process and constitutes "injury" under policy); *Porter v. Am. Optical

Corp.*, 641 F.2d 1128, 1144 (5th Cir. 1981) (same).[2] Experts agree. For example,

asbestosis has been described as a progressive disease "characterized by

pulmonary fibrotic changes which develop slowly over the years. The process

begins near the time of initial exposure. The fibers insidiously injure the lungs

throughout the period of exposure, and the process continues even after physical

---

[2] The legal definition of "injury" in other contexts supports a finding that inhaling asbestos causes certain and immediate injury. For example, in *Department of Labor & Industries v. Fankhauser*, 121 Wn.2d 304, 311, 849 P.2d 1209 (1993), this court held that the last injurious exposure rule did not bar workers from compensation even though their last exposure to asbestos occurred during noncovered self-employment. Notably, the relevant injury was each *exposure* to asbestos throughout employment. Likewise, a tort claim arises when a plaintiff is exposed to asbestos and not when he or she discovers the injury. *See Koker v. Armstrong Cork, Inc.*, 60 Wn. App. 466, 472, 804 P.2d 659 (1991) ("injury producing event" was exposure to asbestos, so tort claim arose before 1981 tort reform act); *Krivanek v. Fibreboard Corp.*, 72 Wn. App. 632, 635, 865 P.2d 527 (1993) (same); *Mavroudis v. Pittsburgh-Corning Corp.*, 86 Wn. App. 22, 34, 935 P.2d 684 (1997) (Washington Product Liability Act did not apply because both the exposure and the tissue changes leading to the disease occurred well before the effective date of the act); *see also Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1219 (6th Cir. 1980) (noting universal medical agreement that asbestosis "occurs" at exposure and not when disease is discovered), *decision clarified on reh'g*, 657 F.2d 814 (6th Cir. 1981).

5

symptoms become evident." Pamela J. Layton, Comment, *Manifestation: The Least Defensible Insurance Coverage Theory for Asbestos-Related Disease Suits*, 7 U. PUGET SOUND L. REV. 167, 175 (1983) (footnotes omitted).

Thus, I would hold that certainty does not mean absolute certainty that a particular plaintiff will develop a particular disease. Under *Birklid*, an employer must know that injury is certain to occur but need not foretell every specific harm or victim. In fact, in *Birklid*, Boeing did not know which workers would get sick, whether the injuries would be compensable, or the severity of illnesses workers would experience. Nevertheless, this court held that employees' claims fell under the deliberate injury exception because employers knew workers were being continuously injured. Thus, to show "deliberate intention" under RCW 51.24.020, a plaintiff must show that an employer knew with a high degree of confidence that injury would result and yet willfully disregarded that knowledge. This interpretation gives effect to legislature's intent to hold an employer accountable when the employer deliberately intends to produce a disease. *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 963, 977 P.2d 554 (1999) (we interpret statutes so that all the language used is given effect, with no portion rendered meaningless or superfluous). Requiring 100 percent certainty would once again read the statutory exception out of existence in the context of disease—which, given its inclusion of "disease" in the definition of injury for purposes of the exception, would violate the

legislature's clear intent. *See* RCW 51.24.030(3).[3] Here, exposure to asbestos caused immediate and certain scarring in Walston's lungs—under the statute, this satisfies the injury requirement once and if the scars develop into a compensable disease.

II. This Interpretation of *Birklid* Satisfies the IIA's Purpose of Balancing Competing Interests While Also Deterring Intentional Wrongdoing

*Birklid* is consistent with general tort concepts outside the workers' compensation context. The gradations of tortious conduct can best be understood as a continuum. *Woodson v. Rowland*, 329 N.C. 330, 341-42, 407 S.E.2d 222 (1991) (discussing the *Restatement (Second) of Torts* § 8A & cmt. b (1965)

---

[3] In *Travis v. Dreis & Krump Manufacturing Co.*, 453 Mich. 149, 190, 551 N.W.2d 132, 150 (1996), the Michigan Supreme Court interpreted a similar intentional tort exception in their state's Worker's Disability Compensation Act. In his concurrence in part, dissent in part, Justice Levin writes:

> As the lead opinion implicitly recognizes, absolute unavoidability of the consequences cannot be the standard for determining when an event is "certain to occur." Even the deliberate firing of a gun directly at an employee is not certain to cause injury if the employer's aim is untrue. Yet, if the bullet should find its mark, no court would hesitate to find the injury "certain to occur" despite its evitability.

*Id.* at 194-95. Justice Levin continues:

> Properly understood, the term "certain" in the statute must mean some unacceptably high, but not complete, risk. It is higher than our previous formulation, "substantial certainty." Similarly, it represents greater danger than the risk necessary to support negligence or even gross negligence. Nonetheless, it cannot mean a one hundred percent likelihood that an injury will occur, because such certainty does not, as a practical matter, exist in this world.

*Id.* at 195 (Levin, J., concurring in part, dissenting in part). I agree with this analysis.

hereinafter REST. 2D TORTS) and *Prosser and Keeton on the Law of Torts* § 8, at 35

(W. Page Keeton ed., 5th ed. 1984)). The most aggravated conduct is where the

actor has the subjective purpose or desire to bring about the probable

consequences of his conduct. REST. 2D TORTS § 8A & cmt. b; PROSSER AND

KEETON, *supra.* But "intent" is broader than a desire to bring about results. REST.

2D TORTS § 8A & cmt. b. One who intentionally acts knowing that particular results

are substantially certain to follow also "inten[ds]" the results. *Id.* cmt. b.

> As the probability that [a certain] consequence[] will follow decreases,
> and becomes less than substantial certainty, the actor's conduct loses
> the character of intent, and becomes mere recklessness . . . . As the
> probability decreases further, and amounts only to a risk that the
> result will follow, it becomes ordinary negligence . . . .

*Id.*

We follow the basic rules discussed in the *Restatement.* We find intent

where a defendant acted with a purpose to achieve the result of his act or where

he or she believed that the consequences were substantially certain to result.

*Bradley v. Am. Smelting & Ref. Co.*, 104 Wn.2d 677, 683, 709 P.2d 782 (1985).

However, mere negligent or reckless conduct does not satisfy the intent element.

*Cf. Sorensen v. Estate of McDonald*, 78 Wn.2d 103, 109, 470 P.2d 206 (1970) (in

a host-guest context, wanton misconduct contemplates intentional conduct on part

of host driver that is more reckless and dangerous than gross negligence, yet short

of premeditated and deliberate harm).

Our holding in *Birklid* interprets the intentional tort consistently with general tort principles while still keeping in mind the IIA's purpose of balancing competing interests. 127 Wn.2d at 859 (IIA is a "grand compromise" between employers and workers). Prior to *Birklid,* our case law set a high bar for satisfying the intentional-wrong exception, requiring proof of specific intent to injure. *Id.* at 860 (citing *Delthony v. Standard Furniture Co.*, 119 Wash. 298, 300, 205 P. 379 (1922)). The *Birklid* court noted that this interpretation had "effectively read the statutory exception to the IIA's exclusive remedy policy nearly out of existence." *Id.* at 862. Our court apparently recognized that the workers' compensation system confronts the unpleasant, harsh reality that, at times, employers will knowingly expose workers to injury and disease.[4] Accordingly we concluded that the phrase "deliberate intention," while at times referring to specific intent to injure, can also mean that the employer (1) had actual knowledge that an injury was certain to occur and (2) willfully disregarded that knowledge. *Id.* at 865-66. Importantly, neither RCW 51.24.020 nor tort principles require a 100 percent probability that an action will cause a specific result; certainty can be achieved with less.

The *Birklid* rule appropriately attempts to capture the categories of employer conduct that are perhaps not specifically intended to harm, but that are sufficiently

---

[4] Other Washington statutes evidence a specific concern for hazardous exposures in the workplace. *See* RCW 49.70.010 (enacted in 1984; "legislature finds and declares that the proliferation of hazardous substances in the environment poses a growing threat to the public health, safety, and welfare"); RCW 70.105D.010(2) (initiative measure approved 1988; "[a] healthful environment is now threatened by the irresponsible use and disposal of hazardous substances").

egregious so as to constitute an "intentional wrong." This pronouncement was not intended to expand the narrow intentional tort exception to workers' compensation exclusivity. Rather, it constitutes this court's effort to identify employer intentional torts under the IIA by borrowing from the intent standard that would apply to any other intentional tort claim in this state.[5] By adopting the *Birklid* standard, this court furthers the workers' compensation objective of workplace safety while balancing the interests of employer and employee. At the same time, it furthers the general tort principle that injuries are to be compensated and antisocial behavior is to be discouraged. *See* PROSSER & KEETON, *supra*, § 1, at 3.

III. This Interpretation of *Birklid* Will Not Initiate a Flood of Litigation

Amicus argue that allowing plaintiff to survive summary judgment here could potentially open our courts to a flood of litigation. Jurisdictions that require a showing of specific intent to injure appear to be similarly concerned with eroding the protections of exclusivity. Like courts in those jurisdictions, amici cite to treatises authored by Arthur Larson, a prominent legal scholar in the area of workers' compensation law. Decades ago, Larson warned that applying the substantial certainty test would lead to a "flood of exceptions to exclusiveness" that

---

[5] In *Birklid*, 127 Wn.2d at 865, we declined to adopt the substantial certainty test of Michigan, South Dakota, Louisiana, and North Carolina, adopting for a narrower standard. I would hold that the narrower standard we adopted requires a virtual certainty that injury or death will result. *See* FLA. STAT. § 440.11(1)(b) (intentional tort when employer acts knowing that injury is "virtually certain" to occur); *Van Dunk v. Reckson Assocs. Realty Corp.*, 210 N.J. 449, 460-61, 45 A.3d 965, 972 (2012) (substantial certainty standard requires a virtual certainty).

would "threaten to destroy the defense altogether." Arthur Larson, *Tensions of the Next Decade, in* NEW PERSPECTIVES IN WORKERS' COMPENSATION 21, 30 (John F. Burton Jr. ed., 1989).

But more recently, Larson, along with other proponents of the "actual intent" standard, admitted that jurisdictions adopting the "substantial certainty" standard have not harmed their workers' compensation systems. 6 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 103.04[4], at 103-39 (2014). Larson acknowledges that "in most instances, the predicted flood of litigation has not occurred, mainly because the courts, undoubtedly conscious of the dangers, have been quite conservative about allowing these kinds of exceptions to exclusivity. Most have been careful to limit their use to the most egregious cases." *Id.* Indeed, while jurisdictions adopting the substantial certainty standard interpret the scope of the intentional tort differently, the general consensus remains that the exception is a narrow one. *See Jensen v. Sport Bowl, Inc.*, 469 N.W.2d 370, 371-72 (S.D. 1991) (majority rule in this country is to construe the intentional tort exception narrowly); *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 33, 109 P.3d 805 (2005) (discussing Washington's historically narrow interpretation of RCW 51.24.020).

In sum, workers' compensation is the exclusive remedy for negligent and reckless acts. It is also well settled that employees may still sue in tort when an employer specifically intends to cause injury. The difficulty lies in between, where the employer is not motivated by a desire to harm but takes a calculated risk with

11

the lives and safety of employees. In these cases, we joined those jurisdictions

that have rejected the specific intent rule. *See Birklid*, 127 Wn.2d at 862-63. We

did not experience a flood of litigation following *Birklid*. Applying *Birklid* and ever

mindful of the IIA's purpose, I would clarify that certainty is more than a mere

possibility or substantial probability of injury but is something less than actual

certainty. Because this is not an expansion of *Birklid*, I find amici's fears

unwarranted.

IV.    Walston Has Alleged Sufficient Facts To Survive Summary Judgment

Application of the intentional tort exception to workers' compensation is fact

specific. In Washington, four elements have proved helpful in determining if the

employer acted intentionally: (1) whether the employer knew of the dangerous

condition in advance, having observed the injuries or received complaints from

employees (*Birklid*, 127 Wn.2d at 853); (2) whether the employer assured

employees of their safety despite knowledge to the contrary (*Baker v. Schatz*, 80

Wn. App. 775, 778, 912 P.2d 501 (1996)); (3) whether the employer's

actions/omissions resulting in injury were ongoing and long term (*Hope v. Larry's

Markets*, 108 Wn. App. 185, 189-90, 29 P.3d 1268 (2001)); and (4) whether the

health impacts from exposure were predictable (*Vallandigham*, 154 Wn.2d at 18)

(behavior of a child with special needs is not predictable).[6]

---

[6] Other jurisdictions faced with the same issue consider similar factors. West Virginia's
statute specifically directs the trier of fact to find (1) that a specific unsafe working
condition existed in the workplace which presented a high degree of risk and a strong
probability of serious injury or death; (2) that the employer, prior to the injury, had actual

12

Here, Walston has alleged sufficient facts to survive summary judgment. *City of Sequim v. Malkasian,* 157 Wn.2d 251, 261, 138 P.3d 943 (2006) (summary judgment is appropriate if there are no genuine issues of material fact and if reasonable minds could reach but one conclusion). In 1985, Walston's supervisor forced him to work for a month under asbestos abatement contractors who wore "moon suits." The work created a shower of asbestos dust that fell visibly on Walston's workstation. When Walston and his co-workers asked for protective equipment, their Boeing supervisor told them to go back to work.

At the time, evidence establishes that Boeing knew that asbestos dust was dangerous and that employees required protection when working around asbestos. OSHA had promulgated emergency regulations 13 years earlier to protect workers from asbestos exposure. Boeing also knew that any amount of asbestos could harm its workers; there is no safe level of exposure when it comes to asbestos.

---

knowledge of the existence of the specific unsafe working condition; (3) that the specific unsafe working condition was a violation of a state or federal safety statute, rule, or regulation; (4) that the employer nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and (5) that the employee exposed suffered serious compensable injury or compensable death as a direct and proximate result of the specific unsafe working condition. W. VA. CODE § 23-4-2. New Jersey requires courts to assess not only whether the employer acted with knowledge that injury was substantially certain to occur but also whether the injury and the circumstances surrounding it were part and parcel of everyday industrial life or plainly outside the legislative grant of immunity. *Millison v. E.I. du Pont de Nemours & Co.,* 101 N.J. 161, 179, 501 A.2d 505 (1985). Michigan has reasoned that "when an employer gives a worker discretion in deciding how to accomplish a task, and the employee chooses a dangerous option, the employer cannot be 'certain' that an injury will follow." *Howard-Johnson v. V&S Detroit Galvanizing, LLC,* 895 F. Supp. 2d 854, 861 (E.D. Mich. 2012).

One of Walston's co-workers had already died of mesothelioma from inhaling asbestos fibers in the hammer shop.

Specifically, Boeing had detailed, documented knowledge that stripping asbestos from overhead steam pipes presented an extraordinary danger and, thus, hired a professional abatement team to remove the asbestos. Boeing also knew during these types of asbestos abatement projects, "all workers in the area" should be provided protective equipment, including an approved respirator for protection. Indeed, the asbestos abatement contractors who worked in close proximity to Walston wore "moon suits" with ventilators to protect them from breathing in asbestos dust.

One of Walston's experts, Dr. Brodkin, concluded that Walston's month-long 1985 ordeal was a substantial contributing factor to his contracting mesothelioma in 2010 and was "likely by far . . . the highest level of exposure" Walston experienced during his Boeing career. Dr. Longo said of Boeing's 1985 conduct:

> I've never seen anything like that. I was astonished. I showed this to
> our [industrial hygiene] chair, and he used words like criminal that they
> would do something like that. . . . [T]his is such an outrageous example
> of complete disregard for the workers in the facility . . . .

Given this evidence, I would hold that Walston has raised a material question of fact as to whether Boeing deliberately intended to produce injury when it forced workers to work under a shower of asbestos.

CONCLUSION

The IIA provides immunity for employer negligence. Employer liability for intentional torts will still depend on the worker's ability to prove intent. An intentional wrong must amount to a virtual certainty that bodily injury or death will result. A mere probability, or knowledge that injury "could" result, is insufficient. This interpretation comports with general legal principles and is true to the legislative intent when considered in light of the underlying purposes of the IIA.

Washington has a "long and proud history of being a pioneer in the protection of employee rights." *Drinkwitz v. Alliant Techsystems, Inc.*, 140 Wn.2d 291, 300, 996 P.2d 582 (2000). Accordingly, the court should be more, not less, vigilant in protecting workers when employers deliberately expose their workers to asbestos—a known deadly substance. The only way to deliberately "produce" the disease of mesothelioma is to intentionally and knowingly cause workers to inhale asbestos. It would undermine the purpose of the statute if an employer could implant a ticking time bomb in an employee's body and escape liability simply because the particular injury that resulted could not be predicted with absolute certainty. I would hold that the trial court properly denied Boeing's motion for summary judgment, and therefore, I would reverse the Court of Appeals, reinstate the trial court's denial of Boeing's summary judgment motion, and remand for further proceedings.

Accordingly, I dissent.

Wiggins, J.

Geder McCd. J.

González, J.

Steph, J.