# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| WASHINGTON STATE DEPARTMENT OF TRANSPORTATION, | |
| Plaintiff, | No. 51025-1-II |
| v. | |
| SEATTLE TUNNEL PARTNERS, a joint venture; TUTOR PERINI CORP.; and DRAGADOS USA, INC., | |
| Defendant. | UNPUBLISHED OPINION |
| SEATTLE TUNNEL PARTNERS, a joint venture, | |
| Third Party Plaintiff/Respondent, | |
| v. | |
| HITACHI ZOSEN U.S.A., LTD., a Delaware corporation; HITACHI ZOSEN CORP., a foreign corporation; and HNTB CORP., a Delaware corporation. | |
| Third Party Defendants. | |

No. 51025-1-II

HITACHI ZOSEN U.S.A., LTD., a Delaware corporation,

Fourth Party Plaintiff,

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND; ZURICH AMERICAN INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA; FEDERAL INSURANCE COMPANY; and SAFECO INSURANCE COMPANY OF AMERICA,

Fourth Party Defendants.

HITACHI ZOSEN U.S.A. LTD., a Delaware corporation,

Plaintiff,

v.

WASHINGTON STATE DEPARTMENT OF TRANSPORTATION and SHANNON & WILSON, INC.,

Defendants.

SEATTLE TUNNEL PARTNERS, a joint venture,

Plaintiff/Respondent,

v.

SHANNON & WILSON, INC., a Washington corporation; and WSP USA, Inc., formerly known as PARSONS BRINCKERHOFF, INC., a New York corporation,

Defendants/Petitioners.

2

SUTTON, J. — In early 2011, Washington State Department of Transportation (WSDOT) contracted with Seattle Tunnel Partners (STP), Respondent, to construct an underground bored tunnel in Seattle. In December 2013, during excavation of the tunnel, the boring machine encountered the steel casing of an abandoned test well and could not continue its progress. WSDOT filed suit against STP for breach of contract related to the stoppage. STP investigated the boring machine's trouble and ultimately brought a counterclaim suit against WSDOT, in part, for failing to disclose the well. Six months later, STP filed suit against Shannon and Wilson (S&W) and WSP USA, Inc.[1] (Collectively, "Appellants").

On discretionary review, Appellants appeal the superior court's denial of their joint motion for summary judgment dismissal of STP's negligence and implied indemnity claims against them. Appellants argue that all of STP's claims against Appellants are barred by the three-year statute of limitations. STP responds that the discovery rule applied to toll the statute of limitations on its negligence claims because STP was unable to determine the necessary facts regarding causation until after it had completed its investigation into the boring machine's breakdown. STP also responds that Appellants never properly challenged STP's implied indemnity claims and therefore, the issue is not preserved for appeal.

We agree with Appellants that the superior court erred by denying their motion for summary judgment of STP's negligence claims. However, we also hold that Appellants failed to sufficiently challenge STP's implied indemnity claims before the superior court. Consequently, we reverse in part and remand for further proceedings.

---

[1] WSP USA, Inc. was formerly known as Parsons Brinckerhoff, Inc.

FACTS

I. BACKGROUND

In 2001, WSDOT engaged WSP, an engineering and design firm, as a consultant to assist in the process of evaluating the repair or replacement of the Alaskan Way Viaduct. As part of its contract with WSDOT, WSP engaged S&W, a Seattle based geotechnical engineering firm, to conduct geologic profile logs, groundwater pumping tests, and to prepare technical memoranda relating to the Alaskan Way Viaduct replacement alternatives and related geotechnical issues. Between 2001 and 2010, WSP and S&W conducted various investigative field explorations. In 2002, they installed a pumping well identified as Test Well 2 (TW-2). TW-2 had an eight-inch steel casing.

In 2009, WSDOT determined that a bored underground tunnel stretching approximately 1.7 miles long and 57 feet in diameter was the best option for the viaduct replacement project. In 2010, S&W and WSP jointly issued a geotechnical baseline report (GBR) for the tunnel project. The purpose of the GBR was for "[s]etting the baseline subsurface site conditions expected to be encountered in the performance of the [w]ork." Clerk's Papers (CP) at 1011. S&W additionally prepared a Geotechnical and Environmental Data Report, the stated purpose of which was to "present[] geotechnical and environmental data collected for the current and previous alignments of the project." CP at 1022.

In January 2011, WSDOT and STP entered into a design-build contract to execute the tunnel plan. As part of the contract, STP procured a tunnel boring machine (TBM). STP commissioned the TBM through Hitachi Zosen U.S.A., Ltd. (Hitachi). STP launched the TBM and started boring the tunnel on July 30, 2013.

On approximately December 4, 2013, STP employees observed that a hollow steel casing had emerged from the surface of the project site, directly above the TBM. The TBM continued tunneling, but the advance rate slowed and the temperature of the TBM rose until, on approximately December 6, STP stopped the TBM to investigate. That same day, Juan Luis Magro, a construction manager for STP, e-mailed other employees of STP about the problem, acknowledging that the TBM had encountered steel casings. He observed, "the extension of the damages in the cutterhead and/or screw conveyor produced by encountering these steel art[i]facts is unknown at this point, although it is a given that there will be some." CP at 893.

On December 9, STP project manager Chris Dixon sent an e-mail to STP's chief executive officer, stating:

> Matt Preedy just informed us that the obstruction encountered by the TBM is an 8 inch diameter steel pipe, 160 feet long, that was used by WSDOT as an observation well on a previous alignment.
> We hit it right where WSDOT left it in the ground.
> The [differing site condition[2]] has been identified.
> We (WSDOT and STP) have been receiving media questions all day about why [the TBM] is stopped and what [the TBM] has encountered.
> It will be interesting to see how WSDOT responds to these questions now that the obstruction has been identified.

CP at 872.

WSP seemed less sure as to what had caused the stoppage. On December 10, a WSP engineer responded, "[n]o one knows," when a WSP colleague asked "what's going on?" CP at 1198.

---

[2] Differing site condition, as defined in the design-build contract.

On December 12, 2013, STP wrote a letter to WSDOT explaining that STP was beginning an investigation into the cause of the stoppage. STP explained that it had learned on December 9 that the TBM had encountered an 8-inch diameter steel pipe that WSDOT installed in 2002. The letter stated:

> In the event that the encountering of this pipe is determined to be, upon the completion of STP's investigation, the cause for the stoppage in tunneling and/or the cause for an increase in STP's cost and time for performance, STP hereby reserves its right to request a Change Order to provide an extension of the Completion Deadlines and an increase in compensation.

CP at 866. That same day, e-mails between WSP engineers stated that theories as to why the TBM had stopped were "[a]ll speculative." CP at 1203.

On December 17, WSDOT wrote to STP identifying the steel pipe the TBM encountered as part of the casing for TW-2. On December 31, STP wrote to WSDOT describing the steel that had been removed from the TBM and the ground surface during investigation into the stoppage. Dixon explained that "there is almost sixty (60) feet of this pipe remaining below ground surface. It appears that this remaining length of this pipe is the obstruction that is preventing STP from advancing the TBM, resulting in the current stoppage to tunneling." CP at 920.

In mid-December, STP prepared a "TBM Stoppage Report" hypothesizing that "there is an obstruction preventing the normal operations of the machine. The obstructions may be in front of the TBM, within the cutterhead of the TBM or both." CP at 943. The report stated:

> Out of the 119 ft length of 8 inches diameter and ¼" inch thick TW-2 well left in place, only 50 ft were removed from the surface and two chunks of 2-3 ft length were screwed by the conveyors inside the machine. So over 65 ft of steel pipe are still between the excavation chamber in chunks and/or in a mess in front of the cutterhead.

6

>       Regardless of the TBM blockage, the damage that the steel may have created to the TBM components is still unknown.

CP at 943. The report went on to identify that the obstruction *in front of* the TBM "may be anything" including several large boulders, a giant boulder, or steel manmade objects such as the identified steel well casing. CP at 943. The report also identified the obstructions *within* the TBM included, but were not limited to, steel entangled on and within the cutterhead, large boulders, and cobbles. The report concluded that the combination of obstructions in front of and within the cutterhead was the most reasonable theory as to the problems encountered by the TBM.

On January 11, 2014, STP laid out its plan to resume tunneling. The plan explained that STP had learned that the TBM had stopped after running through an abandoned investigation well made of steel, and that the first step in its plan to resume tunneling was to "[t]ry to retrieve what is left of the well casing TW-2 and/or any other potential obstruction in front of the cutterhead, preventing the TBM from mining, and putting the TBM in risk[.]" CP at 903-04.

On January 15, STP wrote to WSDOT responding to questions about the tunnel project. In response to WSDOT's question regarding the potential causes of the damage to the cutting tools, STP responded:

>       We have found again normal wear and tear in some of the Precutting Bits replaced from within the cutterhead arms at atmospheric conditions since the TBM stopped during the excavation of ring #149. However, some other Precutting Bits have been dramatically damaged by what we classify as impact with man-made obstructions, such as steel, following a clear pattern in the cutterhead for localized damage. We believe that the 8 inch diameter well casing left in place is the most likely cause for such serious damage.
>
>       STP was informed of the well casing's existence by WSDOT six days after the well casing was encountered by the TBM. It appears that a portion of the casing may have remained jammed right in front of the cutterhead during the last 12 rings of excavation and damaged the cutting tools during cutterhead rotation as the TBM moved forward.

The TBM and its cutting tools were never designed to break up and mine through steel.

While it is true that the initial launch of the TBM mined through concrete, boulders and cobbles, all of which accelerated the wear on some cutters, requiring them to be changed at Safe Haven #2, once the TBM entered native ground the ground conditions encountered are not considered sufficiently abrasive to cause the level of damage observed on some of the Precutting bits, as discussed above. *We believe that the steel pipe is the primary cause of the damage to the cutting tools.*

CP at 1269 (emphasis added).

An internal WSDOT memorandum created the following week questioned STP's conclusions about the impact of the steel well casing on the TBM. The memo noted:

There has been much discussion related to the 8 inch diameter well casing encountered at Ring 137 on December 3 and the likely impact. At most 60 ft of pipe could have been ingested based on total casing length, less the amount removed from the surface. While the TBM is not designed for excavation of steel pipe, the 3/8 inch thick wall would present little challenge for a TBM cutterhead designed to mine 30,000 psi compressive strength rock boulders up to 8 ft in diameter. Impact damage to cutter carbides inserts is possible, as it is with strong boulders; however, other than local damage to cutters no permanent damage would be anticipated or has been revealed. Furthermore, after encountering the pipe the TBM advanced another 11 rings (or about 58 ft) before stopping on December 6 at Ring 149. During the advance of these 11 rings, no significant changes in the TBM performance were experienced until the last few rings (from about Ring 147 on).

CP at 1217.

On January 28, 2014, STP restarted the TBM and mined the remainder of Ring 149. The next day, STP noticed an increase in temperatures. After determining that several seals in the TBM's outer chambers had broken, STP shut it down indefinitely on February 2, 2014.

## II. PROCEDURAL FACTS

On October 9, 2015, WSDOT filed suit against STP in King County Superior Court for breach of the design-build contract related to the December 2013 TBM stoppage. WSDOT alleged that STP was at fault for the TBM's malfunction. The superior court dismissed the case for lack

of jurisdiction, based on the jurisdiction selection clause of the design-build contract, which designated Thurston County as having exclusive jurisdiction. In March 2016, WSDOT refiled its claims against STP in Thurston County Superior Court.

On July 6, 2016, STP answered and filed a counterclaim against WSDOT, alleging that WSDOT failed to adequately disclose TW-2 in the contract documents. STP also initiated a third-party complaint against Hitachi and HNTB Corporation, the designers and manufacturers of the TBM, alleging that they were alternatively liable for damages related to the TBM stoppage. Hitachi and HNTB filed counter claims for breach of contract against STP.

Six months later, on January 26, 2017, STP filed a complaint against S&W. The following day, STP filed an amended complaint adding WSP as a defendant. STP alleged three causes of action for professional negligence, negligent misrepresentation, and indemnification for "Third Party Incurred Costs" and "Third Party Claims." CP at 301. As damages for its negligence claims, STP sought a money judgment for damages "from hitting TW-2 (including direct physical property damage to the TBM and the resulting impacts and delays)." CP at 303.

On August 4, S&W filed a motion for summary judgment, which WSP joined, to dismiss STP's complaint as untimely pursuant to the three-year statute of limitations applicable to tort claims.[3, 4] During argument on the summary judgment motion, STP conceded that it identified TW-2 as a potential cause of the TBM stoppage almost immediately. However, the parties disputed when STP had sufficient knowledge of causation to trigger the statute of limitations. STP

---

[3] RCW 4.16.080.

[4] The joint motion does not explicitly address STP's indemnity claims but requests that STP's complaint be dismissed in its entirety.

argued that its indemnity claims should survive summary judgment regardless of the superior court's determination on the statute of limitations for the tort claims. S&W and WSP did not address the indemnity issues at the summary judgment hearing.

After hearing argument, the superior court entered an order denying S&W's and WSP's joint motion for summary judgment. It concluded that S&W and WSP met their burden with respect to establishing STP's knowledge of duty, breach, and damages, but that "there are material factual issues in dispute as to whether STP had factual knowledge as to the causation element prior to February of 2014." Report of Proceedings (RP) (9-1-17) at 49. The superior court did not specifically address the indemnity claims. S&W and WSP timely moved for reconsideration of the superior court's order under CR 59(a)(7) and (9), but the superior court denied their motion.

Appellants S&W and WSP moved this court for discretionary review of the superior court's denial of their joint motion for summary judgment and reconsideration. A commissioner of our court considered the superior court's decision denying summary judgment of the tort claims and granted review. Ruling Granting Review (Wash. Ct. App. Mar. 6, 2018). The commissioner's decision focused exclusively on the tort claims, but granted review of the indemnity claims "in the spirit of judicial economy." Ruling Granting Review at 14.

## ANALYSIS

Summary judgment is only appropriate if "'there is no genuine issue as to any material fact' and 'the moving party is entitled to a judgment as a matter of law.'" *Walston v. Boeing Co.*, 181 Wn.2d 391, 395, 334 P.3d 519 (2014) (quoting CR 56(c)). "The appellate court engages in the same inquiry as the trial court, with questions of law reviewed de novo and the facts and all reasonable inferences from the facts viewed in the light most favorable to the nonmoving party."

*Christensen v. Grant County. Hosp. Dist. No. 1*, 152 Wn.2d 299, 305, 96 P.3d 957 (2004). "[W]hen reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law." *Clare v. Saberhagen Holdings, Inc.*, 129 Wn. App. 599, 603, 123 P.3d 465 (2005).

## I. NEGLIGENCE CLAIMS

Appellants argue that the superior court erred by denying their motion for summary judgment because the record clearly shows that STP had sufficient knowledge that TW-2 was responsible for the TBM stoppage as early as December 2013 and no later than January 15, 2014, and therefore, STP's claims were barred by the statute of limitations. STP argues that the discovery rule tolled the statute of limitations because STP did not have sufficient knowledge of the cause of the TBM's damage until February 2014. We agree with Appellants.

Typically, tort claims are subject to a three-year statute of limitations. RCW 4.16.080. The statutory period begins to run as soon as the plaintiff's cause of action accrues and the plaintiff has the right to apply to a court for relief. *Gazija v. Nicholas Jerns Co.*, 86 Wn.2d 215, 219, 543 P.2d 338 (1975). For a tort claim, the requisite elements include: a duty the defendant owes to the plaintiff, a breach of that duty by the defendant, causation, and damages. *Green v. A.P.C.*, 136 Wn.2d 87, 95, 960 P.2d 912 (1998). In negligence actions, an aggrieved party need not know the full amount of damage sustained before a cause of action accrues; it need only know that some actual and appreciable damage occurred. *First Maryland Leasecorp v. Rothstein*, 72 Wn. App. 278, 285, 864 P.2d 17 (1993).

"The discovery rule provides that a cause of action does not accrue until an injured party knows, or in the exercise of due diligence should have discovered, the factual bases of the cause

of action."[5]  *Beard v. King Cty.*, 76 Wn. App. 863, 867, 889 P.2d 501 (1995).  A party who has notice of facts that are sufficient to put it upon inquiry notice is deemed to have notice of all facts that a reasonable inquiry would disclose.  *Green*, 136 Wn.2d at 96.  "[N]otice sufficient to excite attention and put a person on guard, or to call for an inquiry is notice of everything to which such inquiry might lead."  *Am. Sur. Co. of N.Y. v. Sundberg*, 58 Wn.2d 337, 344, 363 P.2d 99 (1961).

The discovery rule aims to avoid the injustice of having a statute of limitation terminate legal remedies before the claimant knows he has been injured.  *Beard*, 76 Wn. App. at 867.  Under this rule, "the plaintiff bears the burden of proving that the facts constituting the claim were not and could not have been discovered by due diligence within the applicable limitations period."  *Clare*, 129 Wn. App. at 603.

Here, even taking the evidence in the light most favorable to STP, the record shows that STP had sufficient notice of TW-2's role in the TBM's damage by January 15, 2014.  As early as December 6, 2013, the day of the TBM stoppage and two days after a steel well casing emerged from the ground above the TBM, a construction manager for STP recognized that the TBM had encountered steel casings and that "it [was] a given" that there would be some resulting damage to the TBM.  CP at 893.  By December 9, the STP project manager e-mailed STP's chief executive officer explaining that the steel casing that the TBM hit was part of an old observation well.  In his e-mail, the project manager claimed, "We hit it right where WSDOT left it in the ground. . . . the obstruction has been identified."  CP at 872.

---

[5] "Due diligence" is not at issue in this case.  "The question of due diligence is only material when a party *should have known* the essential facts of a cause of action."  *Beard v. King County.*, 76 Wn. App. 863, 867 n.2, 889 P.2d 501 (1995).  Here, Appellants argue that STP *had actual knowledge* of the essential facts.

In a series of correspondence between STP and WSDOT between the date of the December 6, 2013 stoppage and early January, STP routinely identified the steel casings from TW-2 as the likely source of the obstruction. The mid-December TBM Stoppage Report prepared by STP identifies that the TBM had encountered TW-2 and ingested some steel. While the stoppage report hypothesized that the extent of damages to the cutterhead and further obstruction of the TBM could be exacerbated by additional roadblocks such as boulders, the stoppage report affirmatively identified TW-2 as a contributing source of the TBM's troubles.

By January 15, 2014, STP stated, "We believe that the 8 inch diameter well casing left in place is the most likely cause for such serious damage," and concluded that "the steel pipe is the primary cause of the damage to the cutting tools." CP at 1269. It is indisputable that by January 15, 2014, at the latest, STP knew that the factual elements of its claims against Appellants existed, thus its claims accrued at that point, and the statute of limitations began running.

STP argues that there are genuine issues of material fact as to when it became sufficiently aware of the cause of the TBM's stoppage, and relies heavily on internal correspondence between S&W, WSP, and WSDOT consultants, all of whom had an interest in mitigating TW-2's role in the stoppage. However, the issue here is what *STP* knew, not what other parties believed. *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 576, 146 P.3d 423 (2006) ("the action accrues when *the plaintiff* discovers the salient facts underlying the elements of the cause of action" (emphasis added)).

STP also argues that the statute of limitations was tolled until it determined whether TW-2 was the "true cause" of the TBM stoppage. Br. of Resp't at 17-18. STP contends that this case is similar to *1000 Virginia*, 158 Wn.2d 566. There, our Supreme Court held that the discovery

13

rule should apply to contract claims involving latent construction defects that the plaintiff would be unable to detect at the time of the breach. *1000 Virginia*, 158 Wn.2d at 578-79. STP contends that *1000 Virginia* stands for the idea that a claim cannot accrue if various potential causes of damage exist. STP is mistaken. The *1000 Virginia* court focused on situations in which "the defect was of a kind that the [plaintiff] would simply *never know* or have reason to know of the defect or that it would cause detectable damage years later." *1000 Virginia*, 158 Wn.2d at 580 (emphasis added).

*1000 Virginia* involved a situation in which the tortfeasing subcontractor initially misled the general contractor by telling it that the defects were outside the scope of its work and attributed the damage to other issues. 158 Wn.2d at 571-72. The court explained:

> There is little to distinguish a case involving latent defects in a building and a case where a surgical instrument is left in the plaintiff's body during surgery. In both cases, the plaintiff may have no way of knowing that a cause of action exists, i.e., no way of knowing the facts that show that the construction contract was breached in the first case or that a duty of care was breached in the latter.

*1000 Virginia*, 158 Wn.2d at 579.

Here, in contrast, the record shows that STP became aware of a problem with the TBM around the time the initial TBM stoppage occurred on December 6, 2013. Further, the record shows that STP identified TW-2 as "the primary cause of the damage" by January 15, 2014. CP at 1269. Neither the fact that STP initially considered the possibility that there may have been additional contributing factors to the TBM's damage nor that it continued its investigation of the stoppage beyond January 15, alters that it had sufficient notice for its claims to accrue. "A person who has notice of facts that are sufficient to put him or her upon inquiry notice is deemed to have notice of all facts that reasonable inquiry would disclose." *1000 Virginia*, 158 Wn.2d at 581.

Further, the fact that WSDOT, S&W, and WSP disputed TW-2's role in the TBM stoppage and damage does not trigger a tolling of the statute of limitations. STP implies that *1000 Virginia* stands for the proposition that any time the parties dispute the cause of the alleged damage, summary judgment is inappropriate. We do not read *1000 Virginia* so broadly.

We agree with Appellants that *Beard* is the more applicable case. In *Beard*, Division One of our court held that the statute of limitations period begins to run when the factual elements of a cause of action exist and the injured party knows or should know they exist, even if the party cannot yet conclusively prove the tortious conduct has occurred. *Beard*, 76 Wn. App. at 868. There, the plaintiffs suspected the defendant's wrongful conduct in 1989 but did not obtain proof until 1992. *Beard*, 76 Wn. App. at 868-69. Nonetheless, *Beard* held that the discovery rule did not apply to extend the commencement of the limitation period beyond 1989. *Beard*, 76 Wn. App. at 868-69.

The court explained:

A smoking gun is not necessary to commence the limitation period. An injured claimant who reasonably suspects that a specific wrongful act has occurred is on notice that legal action must be taken. At that point, the potential harm with which the discovery rule is concerned—that remedies may expire before the claimant is aware of the cause of action—has evaporated.

*Beard*, 76 Wn. App. at 868. Similarly here, the potential harm that the discovery rule seeks to avoid is absent.

Even taking the evidence in the light most favorable to STP, the record shows that STP suspected that TW-2 caused the TBM's damage as early as December 9, 2013, and had concluded TW-2 was the primary cause of the stoppage by January 15, 2014. The record is inconsistent with STP's contention that it did not know what caused the stoppage until February 2014. The record

shows that STP had sufficient knowledge that its cause of action against Appellants had accrued by January 15, 2014, at the latest, and thus, the superior court erred in denying Appellants' motion for summary judgment dismissal of STP's negligence claims, which were not filed until January 26, 2017.

## II. IMPLIED INDEMNIFICATION

STP argues that we should decline to consider Appellants' arguments regarding implied indemnity on appeal because Appellants failed to properly challenge the indemnity claims before the superior court. We agree.

"'It is the responsibility of the moving party to raise in its summary judgment motion all of the issues on which it believes it is entitled to summary judgment.'" *Davidson Serles & Assocs. v. City of Kirkland*, 159 Wn. App. 616, 637, 246 P.3d 822 (2011) (quoting *White v. Kent Med. Ctr., Inc.*, 61 Wn. App. 163, 168, 810 P.2d 4 (1991)). When the moving party raises new issues in its rebuttal materials, the nonmoving party has no opportunity to fully respond, and therefore it is improper. *Davidson Serles*, 159 Wn. App. at 637. Even where a moving party requests dismissal of all of the nonmoving party's claims, if the motion for summary judgment does not address one of the nonmoving party's claims, dismissal of that claim is erroneous. *Davidson Serles*, 159 Wn. App. at 638.

Appellants' motion for summary judgment asserted that all of STP's claims against them are barred by the three year statute of limitations, RCW 4.16.080. However, Appellants focused their motion and argument entirely on STP's tort claims and did not address STP's implied indemnity claims. Only in their reply on summary judgment did Appellants make any argument

that the indemnity claims should be dismissed because they were indistinct from the negligence claims and were otherwise barred by the Tort Reform Act of 1981.

At the hearing on the motion for summary judgment, Appellants did not address the indemnity claims whatsoever. In its response at the hearing, STP briefly addressed "this whole indemnity kerfuffle;" Appellants did not respond. RP (9-1-17) at 39. Consistent with Appellants' written and oral argument, the superior court's order denying summary judgment did not specifically address STP's indemnity claims.

Appellants argue that they did sufficiently challenge the alleged indemnity claims before the superior court by challenging the timeliness of STP's negligence claims because STP's alleged implied indemnity claims are indistinct from STP's negligence claims. Appellants acknowledge that Washington courts have recognized that implied indemnity claims are separate and distinct causes of action from the underlying wrong. *See* Opening Br. of Appellant WSP at 29 (referencing *Cent. Wash. Refrigeration, Inc. v. Barbee*, 133 Wn.2d 509, 946 P.2d 760 (1997)). However, Appellants contend that the penultimate issue here is not whether a party *may* bring an implied indemnity claim separate from its negligence claims, but rather whether *in this case* STP has actually pleaded distinct implied indemnity claims.

We hold that Appellants insufficiently made this argument before the superior court. Because Appellants failed to adequately challenge STP's implied indemnity claims in their motion for summary judgment, we cannot consider whether the superior court's denial of summary judgment dismissal of those claims was erroneous, and consequently, whether the alleged implied indemnity claims remain intact. Because we cannot consider whether the superior court's denial of summary judgment dismissal of the implied indemnity claims was erroneous, discretionary

No. 51025-1-II

review of this issue was improvidently granted. *See* RAP 2.3(b)(1); *See also* RAP 7.3 ("The appellate court has the authority to determine whether a matter is properly before it, and to perform all acts necessary or appropriate to secure the fair and orderly review of a case.").

In summary, we hold that the superior court erred by denying Appellants' motion for summary judgment of STP's negligence claims, but that summary judgment dismissal of STP's implied indemnity claims is not properly before us. Consequently, we reverse in part and remand in part. Upon remand, Appellants are entitled to make arguments on implied indemnity to the superior court. *See White*, 61 Wn. App. at 169.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

WORSWICK, P.J.

MELNICK, J.

18