# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| BLUE RIBBON FARMS PROPERTY OWNERS' ASSOCIATION, a Washington non-profit corporation, | No. 57494-2-II |
| Respondent, | |
| v. | |
| MICHAEL & MARILYN MASON, and the marital community composed thereof, | PUBLISHED OPINION |
| Appellants. | |

VELJACIC, A.C.J. — Michael and Marilyn Mason (the Masons) appeal the superior court's order granting Blue Ribbon Farm Owners' Association's (Association) motion for summary judgment and permanent injunction regarding the Mason's alleged violation of the declaration of covenants, conditions, and restrictions (Declaration). The Masons argue that there are genuine issues of material fact remaining regarding whether (1) the Masons activities violated the Declaration, (2) the Association's board of directors (BOD) waived its ability to enforce the Declaration provisions as it previously knew about the alleged violations and did not act, (3) the injunction ordered is overbroad and more comprehensive than necessary to remedy any abuses, and (4) the attorney fee award should be overturned.

We hold that genuine issues of material fact exist with regard to whether the Masons violated the Declaration by using the airstrip for commercial purposes and by increasing the vehicular traffic beyond normal residential use with the business they operated on their property.

Accordingly, the trial court erred in granting the Association's motion for summary judgment on these issues.

However, we also hold that there are no genuine issues of fact that the Masons' violated the Declaration by operating their home enterprise in a manner that gives an outward appearance of a business. Accordingly, the trial court did not err in granting the Association's motion for summary judgment on this issue.

Accordingly, we reverse in part and affirm in part the order on summary judgment. Because we reverse in part the trial court's summary judgment order, we necessarily must reverse the permanent injunction entered because it enjoins conduct for which we have concluded issues of fact remain. We also reverse the superior court's attorney fee award and deny the Association's request for attorney fees on appeal.

FACTS

I.    BACKGROUND

The Association is a residential community in Sequim. The Association is comprised of 135 members, including the Masons. When purchasing property, each member must abide by the Declaration, crafted for the benefit of all members and for the preservation of the community's residential character. Marilyn Mason is a part of the BOD for the Association.[1]

Located on the Association's common space is an airstrip that all property owners have a non-exclusive right to use for their private planes. However, the use of the airstrip is subject to restrictions outlined in the Declaration. Some of the restrictions prohibit the use of the airstrip "for commercial purposes," disruptive activity, and the operation of a "home business enterprise,"

---

[1] Due to Marilyn and Michael being spouses and having the same last name, when needed we will refer to each party by their first names for clarity. No disrespect is intended.

limiting any home business enterprise to those which are "entirely within the lot owners residential type structures" and operated in a manner that gives "no outward appearance[] of a business" or "increase[s] vehicular traffic."  Clerk's Papers (CP) at 344, 347.

The Masons own and operate a business, West Coast Spin Doctors LLC (WCSD) that does business as the Mason Wing Walking Academy (MWWA), and lists the Masons' residential property as the location.[2]  According to the Masons' annual report filed with the Secretary of State noting changes from 2022, WCSD was first registered in May 2009, and now lists Marilyn as both the registered agent and governor of the business.

MWWA trains five-to-six students daily on wing walking within the Masons' hangar. Wing walking is described as "repetitive climbs from the cockpit to the upper wing rack and along the lower wing" and "climbing around the exterior of the [plane] with a safety harness & cable." CP at 355-56.  MWWA lists the cost of wing walking packages between $750 for the upper wing and $985 for both wings.  The package includes lessons, photos, and a flight.  Lessons are described as "a full day deal," where people "show up first thing in the morning and spend typically 4-5 hours practicing and being coached on climbing around the exterior of the [plane] with a safety harness & cable.  When you have that down, we fly!"  CP at 356.

---

[2] Michael previously had noted that MWWA and his flights were two separate businesses and that the flights offered as part of MWWA were free.  He had also noted that MWWA had insurance.

Following some complaints from fellow Association members, the BOD demanded the Masons stop using the airstrip in November 2021.[3] In his declaration, BOD vice-chairman Andrew Zacharias stated that in January 2022, Michael went to Zacharias's home and talked with him and BOD chairman Mark Long. Michael said that MWWA had provided more than 560 flights the previous year and that its advertised rates ranged from $750 to $985.

Within the same month, Michael attended a meeting of pilots who use the airstrip and BOD members at Long's hangar. Discussions included MWWA's huge profitability after the information shared by Michael and the concern that the Masons were using the airstrip for commercial purposes and not what Michael had previously represented.

In February 2022, the BOD held an executive board meeting where it sought advice from legal counsel regarding the Masons' alleged violations arising from other member complaints. As a result of the meeting, the BOD directed counsel to draft and send the Masons a cease and desist letter.

On March 7, the BOD sent the Masons a formal cease and desist letter. The letter requested the Masons to

cease and desist from using the [Blue Ribbon Farm] BRF airstrip for part of the MWWA operation, or for any other flight activities that generates revenue for you. . . . We understand that you made a verbal representation that you have moved the portion of your MWWA operation that requires the use of the BRF airstrip to the Sequim Valley Airport during the BRF Board of Directors meeting on February 23,

---

[3] The April 2021 complaint by Chris Ogden alleged that Michael was flying over his home while landing four-to-five times a day or more. It also alleged that Michael did not adhere to the flight pattern and instead cut downward and across properties at a low altitude which is "highly annoying" and interferes with Ogden's use and enjoyment, and raises safety concerns. CP at 271. This was not the first time Ogden complained, with a previous e-mail dated in 2018. The 2018 complaint stated that the noise level MWWA produced was "very annoying," as the constant droning as acrobatics are performed was "truly grating," and "particularly egregious, and frankly, rather rude." CP at 273. Ogden further stated that he believed Michael's conduct violated the Declaration. Attached to the e-mail chain were pictures depicting a written petition, signed by over 38 other Association members, requesting a stop to the noise from MWWA.

2022.[4] Please confirm this representation that you will no longer be using the BRF airstrip for your business in writing sent to the undersigned by March 17, 2022. This will remove the need for further discussion as to the other potential violations.

CP at 224. BOD secretary David Woodcock stated that he saw Michael using his yard and the neighbors' yard to take off for MWWA flights after the letter was sent.

The following month, the Masons responded to the cease and desist letter sent via a letter from their attorney, stating the following:

Based on our investigation, it is our position that the Masons do not need cease and desist use of the [airstrip] because the [Association] has abandoned the covenant it currently seeks to enforce.
. . . .
[T]he Association has abandoned Article III Section 2(d) of the Declaration regarding the use of the BRF airstrip for commercial purposes because it has been habitually and substantially violated by other members of the Association. Dave Woodcock, a member of the Association, as well as the Board of Directors, has operated an aerial photography business from his residence within the Association, and, on information and belief, he uses the BRF airstrip for his business. Ken Horwitz, another member of the Association, operates a biplane ride business and, on information and belief, he uses the BRF airstrip for his business. As such, these habitual and substantial violations of Article III Section 2(d) of the Declaration constitute abandonment.
    Moreover, the consensus of the Association and its members has been that the BRF airstrip may not be used for repeated and extensive purposes, such as teaching take-offs, and landings for commercial purposes. However, using the BRF airstrip to depart from and performing commercial activity elsewhere, such as aerial photography, teaching take-offs and landings at [a] different airport, or teaching aerobatics in an offshore area and returning to BRF at the conclusion of those activities has been allowed.
 . . . . The Masons will continue to use the BRF airstrip as they have, and others have, for the last 18 years.

CP at 226-27.

---

[4] This appears to have been a meeting where Michael advised he would stop using the airstrip. It is also the meeting where Marilyn was excused from participating when she refused to recuse herself; it appears the BOD then went into executive session.

Ten days later, the Masons' attorney e-mailed the Association's attorney, noting that Michael had "represented" that he had liability insurance on his plane but "does not have insurance for the wing walking business as it is unavailable." CP at 229. However, Michael stated that each customer signs a waiver assuming the risk when they take the course. The attorney then noted that the Masons would agree to indemnify the Association for any potential liability arising from the business if the Association "agrees to allow [them] to use the BRF airstrip in the operation of [their] business." CP at 229.

On April 8, 2022, the BOD held a meeting discussing a date for the annual Association general meeting and the Masons' Declaration violations. The BOD also discussed the adequacy of the current insurance plans for the airstrip and directors. The meeting was then adjourned so that the BOD could move into a closed executive session. After the closed session, the BOD reconvened with the Association members. The BOD provided a "brief explanation[] of the [closed] proceedings." CP at 104. It noted that it authorized counsel to call the Masons' attorney to discuss bringing the Masons into compliance with the Declaration regarding the operation of MWWA. However, the BOD noted that if discussions with the Masons failed, the BOD will authorize counsel to commence litigation to enforce the Declaration. The BOD and the Masons were unable to reach agreement regarding their dispute.

II.     DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

On May 13, 2022, the Association filed a complaint for declaratory and injunctive relief, alleging the Masons were using the airstrip for commercial purposes in violation of the Declaration.

The BOD subpoenaed the Masons and MWWA tax records, including those from 2011, 2019, and 2021. The 2011 tax returns for MWWA contained a profit and loss statement from WCSD dba MWWA, listed under only Michael's social security number as sole proprietor, showing his occupation as a pilot and Marilyn as a homemaker, not an owner, and noted over $47,000 in other income. The 2019 returns also included a profit and loss statement for a sole proprietorship, listing only Michael and his occupation as a pilot and listing Marilyn as a homemaker, and showing over $138,000 in "sales." CP at 119. As for the 2021 returns, those listed both Marilyn and Michael and had both social security numbers, with Michael's occupation being pilot but now Marilyn's as a wing walking instructor. The 2021 returns also included a profit and loss from business listing only Michael for aviation services as principal business (WCSD) and noting a gross income of over $391,000 with a net profit in "other income" of over $96,000. CP at 118.

Two months later, the Masons sent a letter to all the BRF members. In the letter, the Masons asserted they had "completely surrendered on the point of the airstrip use and stopped using it at their very first request." CP at 257. The Masons also raised allegations that the BOD did not follow its own procedures and rules, there was selective enforcement of the Declaration, and deception.

A week later, the BOD responded. In its letter to the members, the BOD noted it was pursuing enforcement and legal action due to concerns it received from other members of the Association regarding MWWA. The concerns included excessive noise, commercial use of the airstrip, invasion of privacy, tourists and MWWA students trespassing onto private property, liability for the homeowners, damage caused by excessive traffic, and non-resident parking. The BOD also recognized that other private commercial businesses are operating in homes and hangars

at BRF.  However, the difference was that the Masons' business "presents a major liability risk to the Association and only one [business] is currently visible within the community, and only one is the focus of most of the complaints."  CP at 263.  The BOD went on to add:

> Mr. Mason also failed to disclose that after claiming he would not use the BRF's airstrip, he decided to circumvent this claim by taking off from [his] own and a neighbor's front lawn.  When Mr. Mason was asked if he had resumed flying with students, Mr. Mason replied (paraphrasing) "Yes I did, but I didn't use the BRF airstrip."  When asked to explain, he replied (paraphrasing) "I used my neighbor's yard and my own, so technically I'm complying."  This action deteriorated the [BOD's] trust in Mason's claim he would conform to the [Declaration].

CP at 263-64.

Following the exchange of letters, the BOD held a meeting.  At the meeting, Michael moved to drop the litigation, but it did not pass.

In August, the BOD received letters from K. McCoy and Mary Lofstrom, BRF members. In their letter, McCoy stated they lived on the road for over 20 years and has had to listen to Michael and "his plane drone on and on" as he "consistently flies directly over [their] house."  CP at 267.  They noted there was no longer any peace and quiet as Mason flies his plane "most every day, all hours of the day and late into the evening."  CP at 267.  As for Lofstrom, she noted she was "exhausted" from listening to the plane leave the runway "more than 10 times a day" and has seen "commercial flights" occur 12-to-24 times in one day.  CP at 269.

On August 25, 2022, the Association moved for summary judgment.  Attached to its motion were declarations by Judith Endejan, attorney for the Association, Mark Long, Andrew Zacharias, David Woodcock, and Nancy Powell.

8

A.    Declaration of Mark Long

Long stated that due to Marilyn's membership in the BOD and ownership of MWWA, she was asked to recuse herself from the executive meeting in February 2022. She refused. Another member then moved to have her recused, which passed, and Marilyn left the meeting.

Long added that he had personally observed the amount of activity coming from MWWA increase over the years, leading to the Masons purchasing a second plane. And he witnessed Michael use the plane to take off and land at the airstrip with MWWA students for the past several years, including after the BOD sent the cease and desist letter in March 2022.

Additionally, Long stated that when concerns were noted in the past over MWWA, Michael told the BOD that the use was noncommercial because he offered the flight at the end of the lessons for free, assured he was in full compliance with FAA rules, and the Association was named as an additional party in the Masons' insurance.

Lastly, it was not until March 30, 2022, that the Masons provided a written statement stating, "[w]e have voluntarily suspended nonfamily and friend wing walking flights from use of the BRF air strip and will continue to do so until authorized otherwise." CP at 247. However, due to the Masons past misrepresentations, Long noted the BOD strongly felt that it needed a binding agreement with the Masons ensuring they would not use the airstrip for MWWA and they would bring their business into compliance with the Declaration. Nevertheless, when the Masons were presented with such a written agreement, they refused to sign, and legal action was pursued.

B.    Declaration of Andrew Zacharias

Zacharias stated he has been a resident and member of the BOD since January 2022. He lives next door to the Masons and has personally observed how they conduct MWWA as a business. Specifically, on a summer day, MWWA students start to show around 8:30 a.m. in four-

to-six cars. Three of the MWWA planes are kept on the property and are constantly being shuffled in and out of the runway. He then notes that each plane requires a long warm-up, causing them to sit idle for extended periods each afternoon, adding to the noise. Additionally, because MWWA has only one instructor, only one student can be trained at a time while the others congregate both inside and outside the Masons' hangar structure when waiting. Around noon, the students leave for lunch but return later in the afternoon for flights, which, depending on the number of students, would then last until 7:00 or 8:00 p.m.

Zacharias added that after the BOD requested the Masons stop using the airstrip in November 2021, he witnessed Michael take off with MWWA students in December 2021 and, most recently, in March 2022.

C.      Declaration of David Woodcock

Initially, Woodcock stated that as a resident of the community and member of the BOD, he watched the Masons' business grow. It first began as a "small part-time occasional business" with an attached hangar to the home, but grew to a "full-time international business" with a hangar separate from the home for training, and housing of multiple aircraft, and numerous daily flights and clients, which increased the vehicular traffic on the roads and property of neighbors and "wear and tear" of the airstrip. CP at 289.

Woodcock added that in terms of the executive BOD meeting in February 2022, there were six total members of the BOD at the executive meeting because the seventh member, Marilyn, was not present. Woodcock noted it was "because the BOD had moved previously for her recusal from any discussions involving her business, MWWA, and BOD action for MWWA violations of the [Declaration] because of her obvious conflict of interest." CP at 101. Therefore, when the BOD

10

voted on whether to pursue legal action if the discussions were unsuccessful, the vote was unanimous as all six agreed.

D.      Declaration of Nancy Powell

The last declaration provided was that of fellow resident and Association member Nancy Powell.  Powell stated that she lives next door to the Masons, where she watches Michael routinely block the taxiway by parking his planes and client cars on the grass between her house and theirs, often crossing property lines.  Further, MWWA gives lessons almost every day, making it so that there are "cars and people constantly," as many as eight cars at a time.  CP at 282.  Because of this, other planes that want to use the taxiway have to veer next to her house, and sometimes the wings almost touch the corner of her home.  Additionally, when lessons are being conducted, the hangar is open and students can look into her kitchen window, so she has to keep her blinds closed, obstructing her view and reason for living there—to see the Olympic mountains.

Four months later, the Masons responded to the motion.  Attached to their response were declarations from both Michael and Marilyn Mason.  Marilyn's declaration stated:

> 3. I provide wing-walking training services to customers of [MMWA] within the hangar located on my property. . . .
> 4. Several other homes within the [Association] have hangars on their property.  The hangar on my property that I use to train student[s] in has the same roof and siding as the home on my property.
> 5. On average, I train five (5) to six (6) student[s] per day within my hangar for MWWA.  At most, there will be six (6) cars parked on the property, but often there is less than that.  There are other members of the Association that have equal to or more than six (6) cars on their property.

CP 126-27.  Michael declared:

> 2. I operate separately from [WCSD] d/b/a [MWWA] which is owned and operated by my wife, Marilyn Mason.  I offer flights to students of MWWA as a separate service from the training offered to these students by MWWA.
> 3. Since 2011, the [Association] has allowed MWWA and other business to use the [Airstrip].
> . . . .

11

5. I have not used the BRF Airstrip in relation to the wing-walking flight service I provide since December 21, 2021.

6. I attended a Board meeting on February 23, 2022 and represented to the Board that I no longer used the BRF Airstrip for wing-walking activities.

7. On March 30, 2022, I sent a letter to the Board reaffirming that I will not use the BRF Airstrip for wing-walking activities.

. . . .

9. The damage to the driveway by my property is not caused or related to MWWA but rather it is caused by natural erosion from the rain. I have routinely made repairs to the potholes and other damages to the driveway caused by the rain.

10. Neither myself, my wife, nor the MWWA customers park their vehicles on the easement between my property and the neighbors; nor have I blocked access to the taxiway.

. . . .

13. Marilyn and I invested a large chunk of money building our hangar which is tall enough to fit our biplanes which have the wing walking rack on top. Our students need access to both plans to get in enough training. We would have to ferry two airplanes back and forth every day. There is no such hangar available at Sequim Valley Airport. Our students would be forced to train all morning in the elements. If there is any rain, training would have to stop while the cockpit was covered up. This would delay training enough that we would lose customers and create a financial hardship.

CP at 132-34.

The superior court granted the Association's motion for summary judgment. The court also ordered an award of attorney fees and entered a permanent injunction, stating the following:

1. The Masons are permanently enjoined from using the BRF airstrip for the purpose of operating flights for the MWWA or any other commercial business.

2. The Masons are permanently enjoined from conducting their business, MWWA, or any other business activity that involves the offering of wing-walking training, outside the confines of their residential structure, as they have done in the past, through use of a hangar and other property outside of their residence for the purpose of conducting wing-walking lessons and inviting students to their property for wing-walking lessons and experiences. The Masons are ordered to comply with the Declaration Art. V., Section 6.

CP at 16-17.

The Masons appeal.

12

ANALYSIS

I.  SUMMARY JUDGMENT

We review summary judgment orders de novo.  *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 410, 430 P.3d 229 (2018).  We perform the same inquiry as the trial court in its review.  *City of Seattle v. Long*, 198 Wn.2d 136, 145, 493 P.3d 94 (2021).

We consider the facts and reasonable inferences in the light most favorable to the nonmoving party.  *Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 287, 481 P.3d 1084 (2021).  Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  CR 56(c).  "A genuine issue is one upon which reasonable people may disagree; a material fact is one controlling the litigation's outcome."  *Youker v. Douglas County*, 178 Wn. App. 793, 796, 327 P.3d 1243 (2014).  "The moving party bears the burden of showing that there is no genuine issue of material fact.  If this burden is satisfied, the nonmoving party must present evidence demonstrating material fact.  Summary judgment is appropriate if the nonmoving party fails to do so."  *Walston v. Boeing Co.*, 181 Wn.2d 391, 395-96, 334 P.3d 519 (2014) (internal citations omitted).[5]  We may affirm the trial court's decision on summary judgment on any ground supported by the record even if the trial court did not consider the argument.  *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989).

---

[5] The Association also argues that the Masons did not assign error to any of the trial court's findings of fact or conclusions of law contrary to RAP 10.3(a)(4) and summary judgment is supported by said findings.  But we review summary judgment decisions de novo; a trial court's findings of fact on summary judgment are irrelevant.  And the conclusion that there is no issue of fact is not a finding of fact.

II.    RESTRICTIVE COVENANTS IN DECLARATION

The Masons argue that the superior court erred in granting the Association's motion for summary judgment by finding a violation of the prohibition against using the airstrip for commercial purposes and a violation of the home enterprise restrictive covenants in the Declaration.

A.    Controlling Declaration Language

Where a declaration creates a restrictive covenant or "an agreement or promise between two or more parties that limits permissible uses of land," enforcement of said promise is a matter of contract law. *Kiona Park Estates v. Dehls*, 18 Wn. App. 2d 328, 335-36, 491 P.3d 247 (2021).

There is no dispute in this case that the Declaration is a contract, that it was properly executed, and is otherwise legally binding. Consequently, the Masons agreed to be bound by said Declaration and its restrictions outlined above when purchasing the property.

B.    Commercial Purposes

The Masons argue that there is a genuine issue of material fact as to whether MWWA used, and continues to use, the airstrip for a commercial purpose. We agree.

Article 3, section 2(d) of the Declaration states "[t]he use of the airstrip for commercial purposes is not permitted." CP at 148. Because "commercial purpose" is not defined in the Declaration, we first look to the dictionary definition of "commercial." *SEIU Healthcare 775NW v. Dep't of Soc. & Health Servs*., 193 Wn. App. 377, 400, 377 P.3d 214 (2016). The first definition of "commercial" is "of, in, or relating to commerce." WEBSTER'S THIRD NEW INT'L DICTIONARY 456 (2002). However, another definition is "from the point of view of profit: having profit as the primary aim." *Id*. Therefore, these definitions suggest that a "commercial purpose" involves some type of transaction for profit.

Here, the tax documents presented on summary judgment clearly show the Masons made a profit from their MWWA business. Specifically, the 2021 tax return shows that MWWA generated $96,575 in other income from the lessons and flights. And the 2021 profit and loss statement for WCSD/MWWA, which was part of the 2021 tax return, lists Michael as the sole proprietor of the business, and also lists $96,575 in net profits, which is the exact same amount listed in the tax return. Also, Michael's declaration notes MWWA is his and his family's "livelihood." CP at 133.

Long declared that he witnessed Michael use the plane to take off and land at the airstrip with MWWA students for the past several years, including after the BOD sent the cease and desist letter in March 2022. Further, Zacharias lives next door to the Masons and has personally observed how they conduct MWWA as a business. Three of the MWWA planes are kept on the property and are constantly being shuffled in and out of the runway. Zacharias added that after the BOD requested the Masons stop using the airstrip in November 2021, he witnessed Michael take off with MWWA students in December 2021 and, most recently, in March 2022. Finally, Powell stated that she lives next door to the Masons, where she watches Michael routinely block the taxiway by parking his planes. Because of this, other planes that want to use the taxiway have to veer next to her house, and sometimes the wings almost touch the corner of her home.

However, Marilyn's declaration stated that she provides "wing-walking training services to customers of [MMWA] within the hangar located on my property." CP at 126. And Michael explicitly denied making a profit from MWWA, stating "[he] operate[s] separately from [WCSD] d/b/a [MWWA] which is owned and operated by [his] wife, Marilyn." CP at 132. Further, Michael states that any flights he offers to MWWA are "a separate service from the training offered to these students by MWWA." CP at 132. Michael stated that he has "not used the [airstrip] in relation to

the wing-walking flight service [he] provide[s] since December 21, 2021." CP at 133. Michael also denied blocking the taxiway.

Accordingly, when viewing the evidence presented on summary judgment in a light most favorable to the non-moving party, which are the Masons here, there is a genuine issue of material fact as to whether the Masons used, and continue to use, the airstrip for a commercial purpose.

C.      Home Enterprise

The Masons argue that there is genuine issue of material fact as to whether their property gave an outward appearance of a business. We disagree.

While the Declaration does allow for home enterprises, article 5, section 6(b) states that "[t]he home enterprise shall [be] operated in a manner which gives no outward appearance[] of a business." CP at 150. "Business" is defined as a "commercial or mercantile activity customarily engaged in as a means of livelihood." WEBSTER'S THIRD NEW INT'L DICTIONARY 302 (2002).

Here, Zacharias stated that on a summer day, MWWA students start to show around 8:30 a.m. in four-to-six cars. Three of the MWWA planes are kept on the property and are constantly being shuffled in and out of the runway. Additionally, because MWWA has only one instructor, only one student can be trained at a time while the others congregate both inside and outside the Masons' hangar structure when waiting. Around noon, the students leave for lunch but return later in the afternoon for flights, which, depending on the number, would then last until 7:00 or 8:00 p.m. Powell also stated that MWWA gives lessons almost every day, making it so that there are "cars and people constantly." CP at 282.

16

Woodcock stated that he has watched the Masons' business grow. It first began as a "small part-time occasional business" with an attached hangar to the home, but grew to a "full-time international business" with a hangar separate from the home for training, and housing of multiple aircraft, and numerous daily flights and clients, which increased the vehicular traffic on the roads and property of neighbors and a "wear and tear" of the airstrip. CP at 289.

Marilyn's statements do not contradict the above statements. According to Marilyn, "[o]n average, I train five (5) to six (6) student[s] per day within my hangar for MWWA. At most, there will be six (6) cars parked on the property, but often there is less than that.' CP at 127. Similarly, Michael's declaration provides no statements that contradict the evidence that the Masons' operation of MWWS on their property gives an outward appearance of a business. Thus, even when the evidence is viewed in a light most favorable to the non-moving party, the trial court did not error in ruling no genuine issue of material fact exists with regard to the Masons violating article 5, section 6(b) of the Declaration by operating their home enterprise in a manner that gives an outward appearance of a business.

### D. Increased Vehicle Traffic

Next, the Masons argue that whether MWWA increased the amount of vehicular traffic beyond what is "normal" for residential use is an issue of material fact. Specifically, the Masons contend that the Association failed to present evidence of what constitutes "normal" traffic. In response, the Association argues that the Masons fail to cite authority to support their position that there must be a standard to determine a violation. We agree that there remains a genuine issue of material fact with regard to whether the Masons' operation of MWWA on their property increased vehicular traffic beyond normal residential use in violation of the Declaration.

17

Woodcock describes the growth of the Masons' business. It first began as a "small part-time occasional business" with an attached hangar to the home, but grew to a "full-time international business" with a hangar separate from the home for training, and housing of multiple aircraft, and numerous daily flights and clients, which increased the vehicular traffic on the roads and property of neighbors and a "wear and tear" of the airstrip. CP at 289. Also, Powell stated that MWWA gives lessons almost every day, making it so that there are "cars and people constantly," as many as eight cars at a time. CP at 282.

However, Michael's declaration stated that "[t]he damage to the driveway by my property is not caused or related to MWWA but rather it is caused by natural erosion from the rain." CP at 133. Also, Marilyn stated that "[o]n average, I train five (5) to six (6) student[s] per day within my hangar for MWWA. At most, there will be six (6) cars parked on the property, but often there is less than that. There are other members of the Association that have equal to or more than six (6) cars on their property." CP at 127.

Viewing the evidence in a light most favorable to the Masons as the non-moving party, there is a genuine issue of material fact as to whether there was an increase beyond what is normal for residential use. The trial court erred by granting summary judgment in the Association's favor on this issue.[6]

III.  THE ASSOCIATION DID NOT ABANDON ITS ABILITY TO ENFORCE BECAUSE OF THE EXPRESS NON-WAIVER CLAUSE IN THE DECLARATION

Next, the Masons argue that the Association waived its ability to enforce the Declaration because it had previously known about violations and chose not to enforce it. We disagree.

---

[6] Our conclusion that there are genuine issues of material fact in regards to the Association's motion for summary judgment does not preclude the Association from seeking, or the superior court from granting other remedies available to the Association on remand, such as a preliminary injunction.

18

Waiver is the "intentional and voluntary relinquishment of a known right" or "by a neglect to insist upon it." *Bowman v. Webster*, 44 Wn.2d 667, 669-70, 269 P.2d 960 (1954). Therefore, waiver is an equitable defense. *Go2net, Inc. v. Freeyellow.Com, Inc.*, 158 Wn.2d 247, 143 P.3d 590 (2006) (stating waiver is an equitable defense); *Mount. Park Homeowners Ass'n, Inc. v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). Comparatively, "'*waiver* is *unilateral* and arises by the intentional relinquishment of a right, or by a neglect to insist upon it, while an estoppel presupposes some conduct or dealing with another by which the other is induced to act, or to forbear to act." *Id.* at 670 (internal quotation marks omitted) (quoting *Kessinger v. Anderson*, 31 Wn.2d 157, 168, 196 P.2d 289 (1948)).

Here, the Declaration expressly includes a non-waiver provision, which states "[f]ailure by the [BOD] to enforce any covenant or restrictions herein contained shall in no event be deemed a waiver of the right to do so thereafter." CP at 151. In light of that provision and the lack of any evidence that the Association stated its intention to relinquish its rights to enforce the Declaration against the Masons, the Masons' waiver argument fails.

IV. THE BOARD FOLLOWED ALL ADEQUATE PROCEDURES OUTLINED IN THE DECLARATION BEFORE FILING SUIT

The Masons also argue that the Association failed to hold a valid vote satisfying the two-thirds majority requirement under article VI, section 3(d) of the Declaration when it excluded Marilyn from the executive meeting in February 2022. The Association responds by arguing that the Masons failed to raise the issue at the trial court level. The Association also argues that regardless, it did hold a valid executive meeting on February 23. We agree with the Association.

Article VI, section 3(d) states that enforcement of the restrictions shall be by "two-thirds vote." CP at 151. Here, the declarations of Long and Woodcock state that the BOD held a meeting in February 2022, where the BOD requested Marilyn recuse herself due to her conflict of interest,

19

and she refused. A BOD member then moved to have Marilyn recused. The motion passed. The BOD then held an executive meeting where it sought advice from counsel regarding possible legal action against the Masons to enforce the Declaration.

The following week, the BOD held another executive meeting without Marilyn where the remaining six BOD members voted on whether to pursue legal action if discussions were unsuccessful with the Masons. Consequently, all six remaining BOD members voted to pursue legal action if discussions with the Masons were unsuccessful, constituting more than a two-thirds vote of the BOD as it was a unanimous vote of the members present. Also, while the Masons argue that the BOD vote failed to meet the two-thirds majority vote requirement, the Masons provide no evidence in their opposition to the summary judgment motion to support their argument. Therefore, the Association is entitled to judgment as a matter of law on this issue.

V.      ATTORNEY FEES

Article VI, section 3(e) of the Declaration allows the court to award the prevailing party reasonable attorney fees and costs for actions for "any action brought by the Association against any lot owner to enforce any term, condition or covenant." CP at 152. A prevailing party is any party that receives a final judgment in their favor. *In re Estate of Carter*, 11 Wn. App. 2d 573, 589 n.7, 455 P.3d 197 (2019).

The Masons contest the award of attorney fees in the underlying judgment. Because we reverse in part the trial court's summary judgment order, we reverse the trial court's award of attorney fees.

The Association argues that it is entitled to attorney fees on appeal pursuant to article VI, section 3(e) in the Declaration. Because we reverse in part and affirm in part the trial court's summary judgment order, no party is the prevailing party. Indeed, additional proceedings before

20

the trial court are necessary. Therefore attorney fees on appeal are inappropriate. We deny the Association's request for attorney fees on appeal.

CONCLUSION

Because genuine issues of material fact exist with regard to whether the Masons violated the Declaration by using the airstrip for commercial purposes and by increasing the vehicular traffic beyond normal residential use with the business they operated on their property, the trial court erred in granting the Association's motion for summary judgment on these issues. Also, because there are no genuine issues of fact that the Masons' violated the Declaration by operating their home enterprise in a manner that gives an outward appearance of a business, the trial court did not err in granting the Association's motion for summary judgment on this issue.

Accordingly, we reverse in part and affirm in part the trial court's order on summary judgment. Because we reverse in part the trial court's summary judgment order, we necessarily must reverse the permanent injunction entered pursuant to the trial court's summary judgment order. We also reverse the superior court's attorney fee award and deny the Association's request for attorney fees on appeal.

_____
Veljacic, A.C.J.

We concur:

_____
Lee, J.

_____
Che, J.

21